Chief Judge Desmond.
Gabriel Pascal, defendant’s intestate who died in 1954, had been for many years a theatrical producer. In 1952 an English corporation named Gabriel Pascal Enterprises, Ltd., of whose 100 shares Gabriel Pascal owned 98, made an agreement with the English Public Trustee who represented the estate of George Bernard Shaw. This agreement granted to Gabriel Pascal Enterprises, Ltd., the exclusive world rights to prepare and produce a musical play to be based on Shaw’s play ‘1 Pygmalion ’ ’ and a motion picture version of the musical play. The agreement recited, as was the fact, that the licensee owned a film scenario written by Pascal and based on ‘1 Pygmalion ’ ’. In fact Pascal had, some time previously, produced a nonmusical movie version of ‘ ‘ Pygmalion ’ ’ under rights obtained by Pascal from George Bernard Shaw during the latter’s lifetime. The 1952 agreement required the licensee corporation to pay the Shaw estate an initial advance and thereafter to pay the Shaw estate 3% of the gross receipts of the musical play and musical movie with a provision that the license was to terminate if within certain fixed periods the licensee did not arrange with Lerner and Loewe or other similarly well-known composers to write the musical play and arrange to produce it. Before Pascal’s death in July, 1954, he had made a number of unsuccessful efforts to get the musical written and produced and it was not until after his death that arrangements were made, through a New York bank as temporary administrator of his estate, for the writing and production of the highly successful “ My Fair Lady”. Meanwhile, on February 22, 1954, at a time when the license from the Shaw estate still had two years to run, Gabriel Pascal, who died four and a half months later, wrote, signed and delivered to plaintiff a document as follows:
“ Dear Miss Kingman
This is to confirm to you our understanding that I give you from my shares of profits of the Pygmalion Musical stage version five per cent (5%) in England, and two per cent (2%) of my shares of profits in the United States. From the film version, five per cent (5%) from my profit shares all over the world.
*317 As soon as the contracts are signed, I will send a copy of this letter to my lawyer, Edwin Davies, in London, and he will confirm to you this arrangement in a legal form.
This participation in my shares of profits is a present to you, in recognition for your loyal work for me as my Executive Secretary.
Very sincerely yours, Gabriel Pascal.”
The question in this lawsuit is: Did the delivery of this paper constitute a valid, complete, present gift to plaintiff by way of assignment of a share in future royalties when and if collected from the exhibition of the musical stage version and film version of “Pygmalion”? A consideration was, of course, unnecessary (Personal Property Law, § 33, subd. 4).
In pertinent parts the judgment appealed from declares that plaintiff is entitled to receive the percentages set out in the 1954 agreement, requires defendant to render plaintiff accountings from time to time of all moneys received from the musical play and the film version, and orders defendant to make the payments required by the agreement. The basic grant from the Shaw estate was to Gabriel Pascal Enterprises, Ltd., a corporation, whereas the document on which plaintiff sues is signed by Gabriel Pascal individually and defendant makes much of this, arguing that Gabriel Pascal, as distinguished from his corporation, owned no rights when he delivered the 1954 document to plaintiff. However, no such point was made in the courts below and no mention of it is made in the motion papers, affidavits, etc., on which plaintiff was granted summary judgment. It is apparent that all concerned in these transactions disregarded any distinction between Pascal’s corporation in which he owned practically all the stock, and Pascal individually, as is demonstrated by the agreement between Lerner-Loewe-Levin, writers and producers of ‘ ‘ My Fair Lady ’ ’, and Gabriel Pascal’s estate. Actually, all this makes little difference since what Pascal assigned to plaintiff was a percentage from Pascal’s “shares of profits” and this would cover direct collections or collections through his corporation.
Defendant emphasizes also the use of the word “ profits ” in the February, 1954 letter from Pascal to plaintiff, and suggests *318 that this means that plaintiff was not to get a percentage of Pascal’s gross royalties but a percentage of some 11 profits ” remaining after deduction of expenses. Again, the answer is that no such point was made in the proceedings below or in this record and everyone apparently assumed, at least until the case reached this court, that what the defendant Pascal estate will get from the musical play and movie is royalties collectible in full under the agreements pursuant to which ‘ ‘ My Fair Lady ’ ’ has been and will be produced. In this same connection defendant talks of possible creditors of the Pascal corporation and inquires as to what provision would be made for them if plaintiff were to get her percentages of the full royalties. This, too, is an afterthought and no such matter was litigated below.
The only real question is as to whether the 1954 letter above quoted operated to transfer to plaintiff an enforcible right to the described percentages of the royalties to accrue to Pascal on the production of a stage or film version of a musical play based on “ Pygmalion ”. We see no reason why this letter does not have that effect. It is true that at the time of the delivery of the letter there was no musical stage or film play in existence but Pascal, who owned and was conducting negotiations to realize on the stage and film rights, could grant to another a share of the moneys to accrue from the use of those rights by others. There are many instances of courts enforcing assignments of rights to sums which were expected thereafter to become due to the assignor. A typical case is Field v. Mayor of New-York (6 N. Y. 179). One Bell, who had done much printing and similar work for the City of New York but had no present contract to do any more such work, gave an assignment in the amount of $1,500 of any moneys that might thereafter become due to Bell for such work. Bell did obtain such contracts or orders from the city and money became due to him therefor. This court held that while there was not at the time of the assignment any presently enforcible or even existing chose in action but merely a possibility that there would be such a chose of action, nevertheless there was a possibility of such which the parties expected to ripen into reality and which did afterwards ripen into reality and that, therefore, the assignment created an equitable title which the courts would enforce. A case similar to the present one in general outline is Central Trust Co. v. *319 West India Improvement Co. (169 N. Y. 314) where the assignor had a right or concession from the Colony of Jamaica to build a railroad on that island and the courts upheld a mortgage given by the concession owner on any property that would be acquired by the concession owner in consideration of building the railroad if and when the railroad should be built. The Court of Appeals pointed out in Central Trust Go., at page 323, that the property as to which the mortgage was given had not yet come into existence at the time of the giving of the mortgage but that there was an expectation that such property, consisting of securities, would come into existence and accrue to the concession holder when and if the latter performed the underlying contract. This court held that the assignment would be recognized and enforced in equity. The cases cited by appellant (Young v. Young, 80 N. Y. 422; Vincent v. Rix, 248 N. Y. 76; Farmers’ Loan & Trust Co. v. Winthrop, 207 App. Div. 356, mod. 238 N. Y. 477) are not to the contrary. In each of those instances the attempted gifts failed because there had not been such a completed and irrevocable delivery of the subject matter of the gift as to put the gift beyond cancellation by the donor. In every such case the question must be as to whether there was a completed delivery of a kind appropriate to the subject property. Ordinarily, if the property consists of existing stock certificates or corporate bonds, as in the Young and Vincent cases {supra), there must be a completed physical transfer of the stock certificates or bonds. In Farmers’ Loan $ Trust Co. v. Winthrop {supra) the dispute was as to the effect of a power of attorney but the maker of the power had used language which could not be construed as effectuating a present gift of the property which the donor expected to receive in the future from another estate. The Farmers’ Loan & Trust Go. case does not hold that property to be the subject of a valid gift must be in present physical existence and in the possession of the donor but it does hold that the language used in the particular document was not sufficient to show an irrevocable present intention to turn over to the donee securities which would come to the donor on the settlement of another estate. At page 485 of 238 New York this court held that all that need be established is (‘ an intention that the title of the donor shall be presently divested and presently transferred ” but that in the particular *320 document under scrutiny in the Farmers’ Loan & Trust Co. case there was lacking any language to show an irrevocable intent of a gift to become operative at once. In our present case there was nothing left for Pascal to do in order to make an irrevocable transfer to plaintiff of part of Pascal’s right to receive royalties from the productions.
The rules as to the requisites for completed gifts have recently been restated by us in Matter of Szabo (10 N Y 2d 94, 98).
The Beaver v. Beaver (117 N. Y. 421) and Matter of Van Alstyne (207 N. Y. 298) cases relied on by defendant deal with the transfer of tangible physical property and are not helpful here. In Young v. Young (80 N. Y. 422, supra) and Vincent v. Rix (248 N. Y. 76, supra), similarly cited by defendant, there was neither a physical delivery nor delivery of a writing.
The judgment should be affirmed, with costs.
Judges Dye, Fuld, Froessel, Van Voorhis, Burke and Foster concur.
Judgment affirmed.