Daniel ELYACHAR and Ralph
Elyachar, Plaintiffs,

v.

GEREL CORPORATION, Huguel Corpo-
ration, Ruradan Corporation, Timston
Corporation, and Jehiel R. Elyachar,
Defendants.

No. 82 Civ. 5070 (ADS).

United States District Court,
S.D. New York.

March 30, 1984.

Esanu, Katsky, Korins & Siger, New York City, for plaintiffs; Mark Walfish,

David Katsky, Stephen J. Swiatkiewicz, Bruce Levine, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants; Leslie Gordon Fagen, Earl H. Doppelt, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge.

This is an action by two sons, Daniel and Ralph Elyachar, to compel their 85-year old father, Colonel Jehiel R. Elyachar, to deliver to them certain stock certificates. They claim their father long ago gave them the interests represented by the certificates, but now refuses physically to deliver the certificates because he wants to revoke the gifts he made. The father contends he never made the gifts claimed by his sons, and that his failure to deliver the certificates proves his intent. These differences resulted in an eight-day trial to ascertain the father's intentions from his statements and actions. The evidence establishes that Colonel Elyachar intended to create and created irrevocable, intervivos trusts (or remainder interests), whereby he implicitly declared himself trustee of the shares he gave to his children and grandchildren as beneficial owners, with full control over the interests to pass to them only upon the Colonel's death or resignation.

Jehiel Elyachar was born in Jerusalem in 1898. He left what was then Palestine around 1928 to come to this country. He became an engineer, and then a builder and owner of office and apartment buildings in Manhattan. He enlisted in the war against Hitler, joining General Patton's army in its march across Europe into the Nazi homeland, and helping to construct the bridges used by Patton's troops in their advance. His service earned him promotion to the rank of full Colonel, as well as the Bronze Star from the United States Army and the Legion of Honor from the French Government. After the war, Colonel Elyachar returned to his real estate business in New York. Over the years he built and managed several valuable properties. He also built a family—twin sons, the plaintiffs in

this case, and a daughter named Ruth, who has interests similar to those of her brothers, but who has refused to join a suit against her father.

### I. *Jurisdictional Defenses*

Defendants contend that diversity of citizenship is absent here, because Daniel and Ralph are domiciliaries of New York, where their father also lives. The evidence establishes, however, that the sons are domiciled in Florida. Daniel has lived in Florida for over ten years, Ralph for over five. They run a real estate business there, as partners in two companies that operate only in Florida. Both have been registered to vote there for several years, and both hold Florida drivers' licenses. The fact that they rent and do not own their homes in Florida has little significance, in that many bona fide domiciliaries rent their homes. Ralph and Dan appear from the record to have economic constraints on their ability to buy homes at this time, given their other Florida land holdings. They left New York in part because their father cannot constructively work with them in running the family real estate. The Colonel himself recognized at trial that his sons "live in Florida." Tr. 867; *see* Tr. 831, 834.

Defendants argue that Ralph owns a Scarsdale home worth over $250,000, that he has spent substantial time there, *see* Tr. 585, 587–88, 592–93, that Ralph's wife has retained her New York citizenship, and that Ralph and his wife filed a verified complaint in a personal injury action in October 1981 in New York County Supreme Court reciting that they reside at the Scarsdale home. In fact, Ralph's wife Alice does regard herself as a New York resident, and while she lives with her husband in Florida she apparently does so with the hope that he will someday return to New York. Alice, however, and not Ralph, owns the Scarsdale home, *see* Tr. 584; and Alice filed the complaint alleging that she and her husband were residents of New York without consulting Ralph or obtaining his authorization for such a statement, *see*

Tr. 589–90. Defendants also refer to statements that indicate that plaintiffs intend to return to New York, particularly if they succeed in this suit and assume control of significant properties. Defendants failed to prove, however, that plaintiffs have formed an intent to return to New York at any specific time. Plaintiffs have made a *bona fide* change in their domicile, and the fact that they might be inclined to return to New York under circumstances that may or may not ever come about does not nullify their present intent to live in Florida, which is potentially unlimited in time. *See generally* 1 *Moore's Federal Practice* ¶ 0.74[3–4] (2d ed. 1983).

■ The suggestion that plaintiffs are guilty of laches or should be estopped from bringing this suit is untenable. Plaintiffs have always understood that their father retained control of the business in which they argue he gave them ownership interests. They have also understood and agreed that they had no right to sell or pledge the stock, all in the Colonel's possession and control, in their names. Until recently, the Colonel gave no hint that he intended to revoke what his sons thought were gifts. In 1982, for example, when the Colonel stopped payment on dividend checks from Gerel Corporation his sons demanded the dividends as owners of "20 percent of the Gerel Corporation," and new checks were then issued at the Colonel's direction. *See* PX 74; *see* Tr. 458, PX 47. The Colonel has not been prejudiced by the alleged delay, moreover. He has voluntarily continued running the family businesses, and would have done so even if he had known all along that some of his companies were irrevocably owned by his children and grandchildren. The missing documents and faded memories encountered at the trial were partially if not exclusively the product of the Colonel's willful suppression of evidence. Had he produced the missing documents they would have established even more clearly that he intended to convey ownership interests to his children and grandchildren. In addition, he failed to call some available witnesses who have intimate knowledge of his intentions, and the evidence of record provides no reason to believe that the potential witnesses who have died would have supported the Colonel's position.

■ Defendants also argue that plaintiffs are barred by the applicable statute of limitations, having sought delivery of the certificates for over 10 years and having been denied delivery or use of the stock during that period. The earlier requests that the Colonel deliver the certificates were not demands, however, but only suggestions that he arrange his affairs to avoid estate tax problems. No demand for the certificates was made until the Colonel recently made clear that he wanted to deny his sons the interests he and the family had always treated as theirs. When that repudiation occurred, plaintiffs promptly made the formal demands that led to this litigation.

## II. *Relevant History and Findings*

■ Plaintiffs claim that their father made them outright gifts of the stock certificates they now seek to have delivered. To establish their claim they must prove the requisites of a valid, intervivos gift of stock. In New York, these are an intention on the part of the donor to make a gift, delivery of the property, and acceptance by the donee. *In re Estate of Szabo*, 10 N.Y.2d 94, 98, 176 N.E.2d 395, 396, 217 N.Y.S.2d 593, 595 (1961); *In re Van Alstyne*, 207 N.Y. 298, 306, 100 N.E. 802, 804–05 (1913). Defendants assert that the Colonel never intended to make a present gift of the stock, that the stock has never been delivered to plaintiffs, and that plaintiffs have never accepted the certificates. Plaintiffs alternatively argue that their father made them gifts of ownership interests in the defendant corporations to the extent reflected by the certificates, retaining for himself the power to control the corporations during his lifetime. This claim was raised and advanced well before trial, and defendants have presented their evidence and argument against it. Plaintiffs' motion to deem the complaint amend-

ed to conform to the proof supporting this claim is therefore granted. *See* Fed.R. Civ.P. 15(b).

The Colonel decided early in his career to place each of the buildings he owned in a separate corporation. Huguel Corporation, for example, owns a building on East 56th Street; Timston Corporation owns a building at Second Avenue and 39th Street; Ruradan Corporation owns a building on East 48th Street; and Gerel Corporation owns a building on Madison Avenue. When Ruradan, Huguel, and Timston were formed, in about 1935, 1938, and 1945 respectively, Colonel Elyachar had not yet given his children ownership interests in those entities. In 1948, however, he arranged through his attorney and accountant to transfer all the stock of Ruradan (a name based on the names of Ruth, Ralph and Dan) to the Drell Corporation, which at that time was owned by his three children. PX 58–61. Thereafter, on December 29, 1948, the original stock certificates issued for Ruradan were cancelled, and four new certificates were issued, reflecting 20 shares to J.R. Elyachar and 10 shares each to the three children. Each 10-share block was "in exchange for 10 shares of Drell Corporation." DX 1003, Certificate Nos. 4–7. The Colonel placed or arranged to have placed on each certificate the stock transfer tax stamps required under New York law for such transfers. *See* N.Y. Tax Law § 270 (McKinney's 1966 & Supp.1983). All three of the children's certificates were countersigned some time after June 1949 by the Colonel's daughter, Ruth Elyachar, who had by that time married Spencer Dvorkin. Tr. 373–74. Some time during the same year, Colonel Elyachar also told his sons Daniel and Ralph that he had given them stock in Ruradan, for which they thanked him. Tr. 426, 566. The Colonel did not give physical control of the certificates in Ruradan to his children, however; rather, he retained them, completely executed in the corporation's stock book, which he kept in a closet or desk at the office from which he managed his real estate business.

During 1950, Daniel and Ralph began working full time with their father in the family business. In February 1950, the Colonel issued 20 shares of stock in Gerel Corporation to himself, 40 shares to his daughter, and 20 shares to each son. DX 1001. In December 1952, the Colonel began to distribute the 10 shares of Huguel Corporation, initially issued to himself in 1938. Colonel Elyachar retained six Huguel shares, and certificates for one share each were issued to his three children and to his son-in-law, Spencer Dvorkin. DX 1002. In December 1953, the Colonel cancelled his six-share certificate in Huguel, issued himself one certificate for two shares, and issued certificates for one share each to the same four beneficiaries of his 1953 transfer. In December 1954, he cancelled his remaining two-share certificate, and issued certificates for one share each to his daughter and son-in-law. Ruth Dvorkin countersigned five of the preceding certificates, which are still in the stock book, and probably signed the missing certificates as well. *See* Tr. 372–73. The Colonel's 10-share certificate in Timston, issued in 1945, was cancelled on October 4, 1955. He issued himself a certificate for five shares, and issued certificates for two shares each to his sons and one share to his daughter. Daniel countersigned the last three certificates. Tr. 427. Stock transfer tax stamps were attached to the stubs of all the certificates issued by all three corporations (Gerel, Huguel, and Timston), but the Colonel kept all the shares in his possession. The children knew of some or all the Colonel's actions transferring shares to them, and thanked him contemporaneously for what they believed were gifts. *See* Tr. 426 (Daniel); Tr. 566 (Ralph); Tr. 371–76 (Ruth).

Other transfers of stock in the corporations occurred in the 1950s. During 1955 two of the three Huguel shares in Spencer Dvorkin's name were transferred to two of Dvorkin's children, and on December 22, 1958, Dvorkin's third Huguel share was transferred to two other Dvorkin children. These transfers were accomplished unilaterally by the Colonel, who had not told

Dvorkin that any shares were in his name. Dvorkin found out in the late 1970s that shares had been in his name, when he examined the books at the Colonel's request. At that time he made notations on the certificate stubs, at the Colonel's direction, to conform "the stubs to the certificates." Tr. 180. In 1958 the Colonel also transferred his five remaining shares in Timston to eight of his grandchildren. All the certificates issued in the 1950s contained stock transfer tax stamps.

In 1975 the Colonel began a series of annual transfers of his 20 remaining shares in Ruradan. During that year he announced to Spencer Dvorkin, who had been working in the Colonel's office since 1960, that "I'm giving five of my shares to Ralph, Dan, and my grandchildren." Tr. 60. He instructed Dvorkin to prepare the necessary papers, including new certificates reducing the Colonel's shares by five, and reflecting the other transfers. Dvorkin filled in the shares and stubs in accord with the Colonel's instructions, and both the Colonel and Dvorkin signed the certificates, on each of which was affixed the necessary stock transfer tax stamps. Dvorkin also drafted a letter for the Colonel to the Colonel's accountant, dated December 9, 1975, which enclosed "a list of 20 people to each of whom I have given ¼ of a share of Ruradan Corporation stock as a gift .... Please figure out what the tax is and prepare the necessary papers for filing." PX 82. The accountant thereupon prepared and the Colonel signed and filed a federal gift tax return for the quarter ending December 1975, reflecting the one-quarter share gifts to 20 people, including Ralph and Dan, on which the Colonel paid a gift tax of $2,569. PX 14; see PX 83.

In 1976 and 1977 the Colonel again gave one-quarter share interests in Ruradan to 20 family members. On both occasions he asked Dvorkin to make all the necessary arrangements, signed all the necessary stock certificates, instructed his accountant to implement his "gifts," filed gift tax returns reflecting the transfers made, and paid the required tax. PX 84–88, 18. During 1977 and 1978 the IRS audited the 1975 and 1976 gift tax returns and assessed deficiencies. The deficiencies were based on a valuation of Ruradan, derived from data supplied by the Colonel and his accountant, all of which assumed that 50 shares were outstanding, and that each transfer of one-quarter share therefore represented 0.5% of the company's stock. In a letter responding to an IRS request that he provide a "list of all stockholders and their holdings," PX 19, the Colonel reported that, as of December 31, 1976, 50 shares were outstanding of which Ralph and Dan each owned 10½. PX 21. The value of the shares was revised upward by agreement, and the Colonel paid gift tax deficiencies, based on the revised values of his gifts, of $2,071 for 1975 and $7,831.43 for 1976. See Tr. 682, 692–94, 699; PX 17–24, 85, 91, 106.

In 1978 the Colonel transferred four of his remaining Ruradan shares to 20 Elyachar family members, including Ralph and Dan. Dvorkin made the necessary arrangements, pursuant to the Colonel's instructions, and the Colonel announced to his accountant in a letter dated December 28, 1978:

> Today I have given one-fifth of a share of Ruradan Corporation to each of the following people .... Will you please prepare the necessary tax returns reflecting this gift.

PX 26. A gift tax return was duly prepared, and Colonel Elyachar signed and filed it. The return reflected gifts in exactly the proportion he had ordered, and called for the payment of a tax of $1,079. PX 108, 109.

In 1978 the Colonel also began to have dividends issued by the corporate defendants. He had been made aware at about that time that if the corporations continued to retain all earnings they would be classified as personal holding companies. His accountants told him that the holding company classification, and consequential tax, could be avoided if the companies distributed certain amounts of earnings as dividends to shareholders. Tr. 741–43. Colo-

nel Elyachar decided to have the dividends issued. He ordered Spencer Dvorkin to compile from the stock books the names of all shareholders and their holdings, and to draw up checks to them in proportion to their stock ownership. Tr. 82–83.

The first distribution was from Huguel. Ralph and Daniel received $2,195.40 each, 20% of the total amount paid out, precisely proportionate to their ownership in the company as reflected in the stock books in the Colonel's possession. This payment enabled Huguel to file a "Claim for Deficiency Dividends Deduction" to recover the tax which would have been lost but for the 1978 payment. Colonel Elyachar signed the return and listed his sons as each owning two of the 10 outstanding shares. A resolution attached to the form recited that Huguel had "authorize[d] payment of a dividend totalling $10,977 to the shareholders of Huguel Corporation pro-rata, payable immediately," and was signed by J.R. Elyachar, Ruth Dvorkin, and Spencer Dvorkin. PX 104.

In 1979, 1980, and 1981, dividend distributions were made to the plaintiffs and others by all four companies, and in 1982 by Gerel. Every distribution was exactly proportional to the percentage of the recipients' stock ownership as reflected in the stock books. Each company reported these dividend distributions in its federal income tax returns. *E.g.*, PX 4–7, 38–39, 105, DX 1042–44. Each company's financial statements reflected these payments as dividends to stockholders. PX 63–64, 68–72. The payment checks frequently had "dividend" written on them. PX 2, 27, 32, 36. The companies also often filed forms or resolutions with the IRS reporting the dividend payments. PX 3, 28, 30, 33, 37; Tr. 87–88, 760–61. In 1979 the Timston tax return included forms for both Ralph and Daniel entitled "Consent of Shareholder to Include Specific Amount in Gross Income." PX 105. Ralph and Ruth reported these dividend payments as income in the year of their receipt; Daniel reported the dividends soon after he was informed in 1981 that the payments were in fact dividends. *See* PX 40, 54–56, 76–79, DX 1064, 1067–68; Tr.

379, 443–45. All the dividend checks were signed by Colonel Elyachar, and were issued at his direction. Finally, when the Colonel stopped payment on the 1982 dividend checks from Gerel, Ralph and Daniel wrote to him as owners of "20 percent stock of the Gerel Corporation" demanding the dividends be reissued to them. PX 74. New dividend checks were issued and sent to plaintiffs by Colonel Elyachar after his sons' demand. Tr. 458.

Throughout the entire period during which these transfers occurred, Colonel Elyachar retained the stock certificates and exercised exclusive control over the corporations involved. At various times the Colonel's sons and son-in-law worked with him, but always at his pleasure. The Colonel repeatedly ejected his sons from the office, often after having invited or even urged them to return. At times the Colonel has wanted his sons to take over control and invited them into the business with that purpose in mind. While he purportedly found them incompetent, the evidence also demonstrates that he would simply change his mind and realize that he wanted to remain in control. The buildings are his "children," and he seems to feel that if he quits working he will die. The Colonel also never permitted anyone to share his complete authority. He demanded and received from his children stock powers signed in blank, though no specific purpose for such powers was ever demonstrated. Finally, while his sons were well aware that certificates in the Colonel's possession described them as the owners of stock in the four corporations at issue, they agreed with the Colonel that they would never attempt to pledge or otherwise use these corporate interests without the Colonel's consent. Tr. 498.

The Colonel's first wife, Jean—the mother of his children—died in 1972, after which he married his second wife, Anna. The record also shows that in recent years the Colonel has become increasingly involved in charitable causes. He has established the Elyachar Welfare Fund, to which he has made and continues to make gifts, and he

directs the distribution of the Fund's assets. The Colonel's sons appear less enthusiastic about giving away large portions of the family wealth, and seem resentful of their father's shift in interest from them to other causes. These factors, the Colonel's lack of faith in his sons' abilities, and the stress that sometimes accompanies father-son relationships all appear to have contributed to the Colonel's decision—gradually formed over the last few years—to cancel all the stock transfers he made to his children and grandchildren during the family's closer times. He testified that this decision does not necessarily mean he intends to leave nothing to his family, although he believes he has more then fulfilled his financial responsibilities to his children. Rather, he wants to replace what he now describes as the testamentary plan reflected in part by the stock transfers with an overall plan consistent with his present interests and desires.

The Colonel's determination to annul his prior acts emerged in several relatively recent events. First, he indicated the lengths to which he would go to cancel prior transfers in a heated dispute he had on February 26, 1981, with Spencer Dvorkin. After calling Dvorkin arrogant, insolent, and incompetent, he announced: "[I will] go to the lawyers, go to jail if necessary and spend $1 million to cancel everything [I have] ever done for [you and your] children." Tr. 116–17. The last dividend payment to Ralph and Dan from Gerel in early 1982 was also a major turning point. The sons for the first time squarely challenged the Colonel's authority, after he stopped payments on checks he had issued. He then sent replacement checks, but with obvious resentment. He wrote:

Dear Ralph and Dan:

I am enclosing a dividend check from Gerel for each of you.

The least you can do is to send a receipt, *and* a thank you note, and also a check for the Elyachar Welfare Fund. This is very important to me. Ruth has sent her check.

I would like an answer by return mail. PX 47.

Dvorkin testified to the Colonel's penchant for secrecy. He often had Dvorkin, rather than the secretary, type confidential letters, and he even kept some information from his accountant. Dvorkin believed the Colonel engaged in this type of behavior because he wanted to be able to disavow everything. Tr. 337. In fact, when the Colonel made his decision to disavow all the transfers of stock in the defendant corporations, he did so with the purpose of destroying evidence that he thought might have limited the effectiveness of his decision. He placed "X" marks through some stock certificates he wished to cancel, and destroyed or hid others. He also appears to have thrown away letters and other documents that might have shown even more conclusively than has been demonstrated by the remaining records that the transfers were intended as gifts and were effectively delivered and accepted.

### III. *Nature of the Transfers*

This case presents a conflict that is painful, but not uncommon. Courts have long had to deal with situations where a person indicates at one point in time that he or she intends a gift, but later disclaims having made it. A gift, like a sale, is a transfer of property. But gifts are transfers without consideration. When a gift is enforced, therefore, the donor suffers an outright forfeiture of property. Furthermore, gifts are usually claimed to have occurred by persons having a strong interest in the outcome, and often long after the donor has died. Courts discount the value of oral testimony about gifts by donors no longer present to dispute the claims. In fact, what an alleged donor might have said about a gift and what he or she might actually have intended can differ, since these matters often concern closely related individuals, who might have great difficulty in being forthright as to their intentions.

### A. *The Colonel's Intent.*

The Colonel correctly contends that, to establish a gift, plaintiffs must show that

he intended to make a gift to them of a *present* interest in the companies, not a gift to take place in the future. He argues that the arrangements he made with respect to the certificates were part of a testamentary plan, to take effect upon his death in the event he had not in the meantime altered it. He claims the evidence establishes that he never intended to surrender control of the corporations to his sons, and therefore that no present interest was conveyed.

The principle espoused by the Colonel was clearly articulated in *Young v. Young,* 80 N.Y. 422, 430 (1880), where Judge Rapallo found that the donor had manifested his intention to give his sons ownership in certain stock, retaining for himself only a life interest. The donor's declarations, however, stated that the interest due was " *'owned and reserved'* by the donor for so long as he shall live, and that the bonds are not to belong 'wholly' or 'absolutely' to the donees till after his death." *Id.* 431–32 (emphasis in original). While the donor's stated desire to make a gift led the Court of Appeals to examine "the case with a strong disposition to effectuate that intention and sustain the gift, if possible," the donor could not effectively make a gift to take effect in the future without any written transfer of ownership delivered to the donee, or without unambiguously declaring a trust. *Id.* at 430, 435–438. *Compare In re King,* 230 A.D. 160, 244 N.Y.S. 228 (3d Dep't 1930) (retention of income with unconditional delivery did not invalidate gift). Furthermore, the bonds at issue were retained by the donor, along with the coupons, and since the duration of his life was uncertain he might have collected the principal on some or all of the bonds before his death. "The reservation accompanying the gift would entitle the donor to possession of the fund." *Young,* 80 N.Y. at 434–35. A gift of the remainder interest in stock would not as likely be subject to complete depletion as the bonds in *Young. See, e.g., In re Brandreth,* 169 N.Y. 437, 62 N.E. 563 (1902).

The present case differs materially from *Young.* Documents and other objective evidence establish that the Colonel intended to give his children and grandchildren gifts of present interests in the corporate defendants. He referred to these transfers as "gifts" in letters, in tax filings, and in corporate reports. While Spencer Dvorkin and the Colonel's accountants were responsible for preparing some of these documents, the Colonel ordered them prepared in the form they took, read them, understood them, and signed them. Furthermore, the Colonel ordered careful and complete changes in the stock books of the companies to reflect the gifts announced to the world in writings. Pursuant to the Colonel's instructions, Dvorkin or some other members of Colonel Elyachar's family or staff recorded each and every transfer on the books by cancelling existing certificates and preparing new ones. Extra certificates were purchased when the Ruradan stock book ran out. All the certificates were duly stamped, and were signed by the Colonel and usually by another family member. The gifts were therefore not a secret to the Colonel's children, who have known since 1949 that gifts of stock were being made to them by their father. Finally, the Colonel ordered "dividends" paid to plaintiffs and other shareholders in the corporations when it became clear that further accumulation of income would result in taxes.

The Colonel contends that he never intended his gifts to be irrevocable. He claims he retained possession of the shares so that he unilaterally could change the plan of distribution they represented. He testified that the shares were made out prior to trips he took to Europe, and were a testamentary device in lieu of a will. He notes that at no time did he permit plaintiffs to exercise any of the normal incidents of ownership in the companies involved. He completely controlled the companies, and plaintiffs have always acquiesced in his control. He recognizes that he represented in sworn statements to the United States Government that his sons owned stock in the companies and that he had made "gifts" to them and others. And he ac-

knowledges that the monies paid periodically to them were "dividends" paid by the companies directly as opposed to gifts out of his own income from those companies. But he is willing to suffer the consequences of these misstatements, he states, rather than the unwarranted forfeiture of property he never intended to convey.

The Colonel did, however, intend to make present, irrevocable gifts to his sons. He transferred the shares at issue during a period when he was close to his sons, or had his sons working with him in the business. The transfers no doubt represented a plan for passing on his property, but they were not made in lieu of or because he lacked a will. The Colonel's keen practical sense, and his practice of seeking and accepting expert legal and accounting advice, make his claim not to have had a will unbelievable. He no doubt had prior wills, but kept them out of evidence. The Colonel's willingness to concede that he lied to our government is more probative of his present state of mind than his conduct or beliefs when the tax and other filings took place a few years ago. The Colonel's love for this country, the gratitude he feels toward it for his security and success, and the debt he knows his people owe the United States for the victory over fascism in which he played no small part, make untenable his present claim of having engaged in fraud with likely criminal consequences. *See, e.g.,* 26 U.S.C. § 7206(1); 18 U.S.C. § 1001; Balter, *Tax Fraud and Evasion,* ¶ 11.03 (5th ed. 1983). He did not lie and would not have lied. Only the pain and anguish of the virtually total alienation from his children that this suit represents could have led him to suggest that he cheated the United States.

The Colonel's claim to have retained full control of the companies is significantly overstated. Over the years, he repeatedly sought the signatures of his children as shareholders on loan authorizations and other commercial documents. Nor is it accurate to state that he denied his children all the benefits and rights of ownership. They received their fair proportion of all dividends paid out by the companies. The Colonel saw fit to obtain his sons' commitment not to pledge their stock interests, reflecting his realization that they might as beneficial owners possess that power, and as indicated above he reissued dividend checks from Gerel when his sons protested "as owners" his cancellation of earlier checks.

While the Colonel's memory was selective, and his testimony incredible as to his claim that he never intended to make irrevocable gifts, he was entirely convincing in claiming that he has never intended to surrender control of the companies during his lifetime. The Colonel is deeply attached to his work, and retained the certificates as well as operating control of the companies because he intended to keep running them until he either died or voluntarily relinquished their management. His children have always recognized this intent. They have never questioned their father's right to operate the companies, and still do not do so explicitly. Each time the Colonel threw them out of his office, they left. When he told them to sign corporate papers, they signed. When he told them not to pledge or otherwise rely upon their stock interests in the companies, they complied.

■ Under these circumstances, while the evidence overwhelmingly establishes intent to make present and irrevocable gifts, the gifts intended were of an ownership interest to the extent reflected in the shares transferred, but without control. The Colonel intended that, if he died, his children would assume complete control of the interests he had transferred. He also intended that they would acquire beneficial ownership immediately upon the transfer of shares, including the right to their fair proportion of dividends, and of capital in the event a corporate distribution or sale were made. But he never intended to convey a power to vote, pledge, or otherwise use the shares to interfere with his management of the companies. As one of Mr. Elyachar's accountants testified: "he really wanted to keep control. That was his overall [objective], during his life." Tr. 816.

The Colonel's intention, therefore, was to convey present and complete beneficial ownership, but without control during his life. Whether the Colonel implemented this intention in a legally enforceable and irrevocable manner are issues dealt with below. But the law recognizes in principle that interests in property may be divided in the manner intended here, if the other requisites of a binding transfer are found to have occurred.

### B. *Delivery of the Intended Interests.*

 The law requires proof of the delivery of gifts to protect alleged donors and their estates from "ill-founded and fraudulent claims of gift, resting only on the assertion of oral words of gift, concerning which the evidence may be doubtful or open to controversy." R. Brown, *The Law of Personal Property* § 7.2, at 78 (3d ed. 1975). The requirement is a relatively objective test that protects against false claims of interest, and even against concessions or statements by alleged donors who decide not to implement the gifts they state they have made or will make. *In re Van Alstyne*, 207 N.Y. 298, 100 N.E. 802 (1913), for example, involved a husband who assured his wife that he would waive a debt that she owed him, but then failed to prepare the necessary papers or to deliver to her the notes and trust deeds that reflected the obligation. Uncontroverted proof of the husband's statements was held insufficient to establish a gift of the debt. The Court explained:

> Because many gifts are sought to be shown by oral evidence after the donor's death, it is necessary for the public good to require clear and satisfactory evidence of the fact to prevent fraud and perjury. There must be a delivery which results in a present change of dominion and ownership. Intention or mere words cannot supply the place of an actual surrender of control and authority over the thing intended to be given.

207 N.Y. at 308, 100 N.E. 802.

 The most definitive evidence of delivery is a physical transfer of the gift to the donee. The *Van Alstyne* Court noted that "physical delivery of a note or other writing constituting a chose in action, with intent to vest in a donee a gift of the indebtedness represented thereby, is the most complete delivery that can be made, and consequently it is sufficient to establish the gift." *Id.* Physical delivery is not always required, however. "The delivery necessary to consummate a gift must be as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit." *Id.* at 309, 100 N.E. 802. The Court found in the facts of *Van Alstyne* "no possible reason for a symbolical delivery. The testator had the immediate actual possession of the notes and trust deeds[;] ... there could have been no reason why he should not have canceled the notes by some appropriate writing thereon or by actually delivering the notes and trust deeds into the physical possession and control of the respondent." *Id.* at 309–10, 100 N.E. 802.

Where good reason exists for the physical retention by a donor of the subject matter of a gift, however, a good delivery can be shown by other circumstances. Thus, Chief Judge Desmond explained in distinguishing several earlier cases, including *Young:*

> In each of those instances the attempted gifts failed because there had not been such a completed and irrevocable delivery of the subject matter of the gift as to put the gift beyond cancellation by the donor. In every such case the question must be as to whether there was a completed delivery of a kind appropriate to the subject property.

*Speelman v. Pascal,* 10 N.Y.2d 313, 319, 178 N.E.2d 723, 725, 222 N.Y.S.2d 324, 328 (1961). In *Speelman,* the delivery by Pascal to his secretary of a letter "giving" a percentage of his "share of profits" from the stage and film versions of "My Fair Lady" was found sufficient, even though at the time no arrangements had been made which gave tangible meaning to the interests granted. "In our present case there was nothing left for Pascal to do in order

to make an irrevocable transfer to plaintiff of part of Pascal's right to receive royalties from the productions." 10 N.Y.2d at 320, 178 N.E.2d 723, 222 N.Y.S.2d 324.

Colonel Elyachar claims no adequate delivery occurred of the stock certificates, and therefore of the ownership interests at issue. The Colonel carefully retained control of the stock certificate books and he deliberately determined not to deliver physical possession of the certificates. Tr. 153–54, 461–63, 841–45, DX 1032, 1034–35, 1107. He rejected suggestions and requests that he deliver the certificates to his sons. He did so, moreover, because he intended thereby to continue to exercise without interference the power to manage the companies, which he believed he might lose by delivering the certificates. The record is also clear that he exercised virtually all the powers associated with the stock, and intended to continue to do so until he either stepped down voluntarily or died.

■ These circumstances establish that the Colonel failed to deliver *present* control of the interests represented by the certificates. They are consistent, however, with his intention to give his sons beneficial ownership interests in the corporations to the extent reflected by the certificates, but without control. Indeed, the Colonel delivered the interest he intended to convey— beneficial ownership—to the fullest extent practicable in light of his intention to retain management control.

The Court of Appeals has stressed that "[t]he delivery required must be such as to vest the donee with control and dominion over the property but this requirement must be tailored to suit the circumstances of the case." *In re Estate of Szabo*, 10 N.Y.2d 94, 98, 176 N.E.2d 395, 396, 217 N.Y.S.2d 593, 595 (1961). With respect to the "transfer of a part interest in stock certificates ...," a symbolical delivery would be sufficient for it is the only kind of delivery that would be practicable under the circumstances where undoubtedly the donor would want to retain possession of the certificate." *Id.* The Court of Appeals

in *Szabo*, however, made clear that even a "symbolical" delivery

> must proceed to a point of no return, and this point can only be reached when there is a transfer of record on the stock books of the company. Obviously the donor does not surrender dominion and control of a part interest until the transfer of record is made because up until that time he may change his mind and withdraw his directive to the transfer agent.

*Id.* Other decisions make clear that, while even the transfer of a corporate interest on the books is alone insufficient to establish delivery of ownership, a valid and irrevocable gift is found if the transfer is coupled with other acts representing tangible expressions implementing the donor's intent. *See, e.g., Richardson v. Emmett*, 61 A.D. 205, 70 N.Y.S. 546 (1st Dep't 1901), *rev'd on other grounds*, 170 N.Y. 412, 63 N.E. 440 (1902).

■ A particularly significant decision is *In re Babcock's Estate*, 85 Misc. 256, 147 N.Y.S. 168 (Sur.Ct. Lewis Co. 1914), *aff'd*, 169 A.D. 903, 153 N.Y.S. 1105 (3d Dep't), *aff'd*, 216 N.Y. 717, 111 N.E. 1084 (1915), decided only two years after *Van Alstyne*. There, a father transferred stock on the books of a closely held corporation to his daughter, but put them in a safe in their home to which the daughter had no access. Thereafter the father, who controlled the corporation, caused dividends to be issued to the daughter in proportion to the shares transferred in her name. The New York courts found that, despite the donor's subsequent effort to deny having delivered the stock to his daughter, a valid and irrevocable gift had occurred. "Delivery may be either actual, symbolical, or constructive, but must be such as to divest the donor of the possession, control and dominion over the thing given." 147 N.Y.S. at 171. Stock certificates are not themselves interests in property, but only evidence of such interests. Delivery of the property interests involved was established in *Babcock* by, among other things, the donor's deliberate transfer of those stock interests on the corporate books, issuance of certificates in

her name, and the payment of dividends directly to her in proportion to the interests transferred. *See id.* at 175. The father's desire to continue to exercise management control made his retention of the physical certificates in his safe consistent with a transfer of beneficial ownership, and the steps he took to implement his intention proved delivery to the extent the circumstances required. *See id.* at 176.

In the present case the Colonel's conduct established far more than a symbolical or constructive delivery of the interests he intended to convey. When he decided to place various corporate interests in his children's names he carefully completed all the requisite formalities for stock transfers. He cancelled his own shares, filled in new certificates for himself and his children based on the number of shares transferred, purchased and affixed stock transfer tax stamps, and had the new certificates signed by the requisite corporate officers, in some instances his own children. He kept the certificates in his control, but made no secret of the fact that transfers had been made. When the stock transfers were substantial enough in value to require payment of a gift tax, the Colonel filed the required returns and paid the tax. Those filings required him to prepare lists of the stock ownership in the corporations at issue, which he physically gave to his accountants and thereafter used for the purpose of deciding the proportions in which dividends should be issued. The gift tax returns also required the Colonel to affirm on pain of civil and criminal sanctions that all the information submitted to the government was true and correct. When the companies' earnings made it financially responsible to issue dividends, the Colonel instructed that the "dividends" be paid to his sons and other donees directly, as the corporate "shareholders," in the exact proportion of their ownership, and the dividend payments were actually delivered to them.

The Colonel also treated his donees as the beneficial owners of the shares he transferred in other significant ways. He not only told his children he had given them shares, but declared this fact to his own accountants and lawyers. When the signatures of stockholders were required, the Colonel obtained signatures from his children, as in filing a "Consent of Shareholder to Include Specific Amount in Gross Income" and in complying with bank requests for stockholder consent signatures for loans. *See* PX 105, 110. These numerous acts of delivery and acknowledgment and the Colonel's proven intent to make the gifts he declared and to which he swore establish an actual or "symbolical" delivery to the donees of beneficial ownership in the shares, including the right to receive any dividends or other payments made by the corporations to their owners.

In this evidentiary context, the Colonel's failure and refusal to deliver physical possession of the certificates reflects, not a retention of beneficial ownership or the power to revoke incomplete gifts, but his intention to manage and control the corporations until he dies or voluntarily surrenders control. He viewed possession of the stock as the physical manifestation of his determination that the donees should have no capacity to interfere with his management of the corporations. He so much as said this to his sons when he insisted they make no effort to pledge their interests in the corporations. He showed this was his purpose by repeatedly inviting his sons into the business in the unfulfilled hope that he would be able to surrender control, and always with the expectation that they would eventually take over. That Colonel Elyachar is the plaintiffs' father also lends support to the finding that he held the shares for his childrens' ultimate benefit, and because he wanted to remain in control. *See In re Estate of Brady*, 228 A.D. 56, 61, 239 N.Y.S. 5, 10 (3d Dep't), *aff'd*, 254 N.Y. 590, 173 N.E. 879 (1930) (natural for husband and father to hold stock he has given to wife and children; "reservation of the right to vote the stock [of closely-held corporation] for his children to avoid voting complications was not inconsistent with the absolute character of the gift"). Given the interests he wished to convey, and the powers he wanted to reserve, Colonel Elyac-

har's delivery could not have been more complete.

### C. *Acceptance of the Gifts*

■ Defendants contend that Daniel and Ralph have failed to meet their burden of proving they accepted the gifts conferred by the Colonel. *E.g., Szabo*, 10 N.Y.2d at 98, 176 N.E.2d 395, 217 N.Y.S.2d 593; *In re Harter's Estate*, 24 A.D.2d 681, 682, 261 N.Y.S.2d 431, 432–33 (3d Dep't 1965). The Colonel's sons acted as shareholders only when asked to do so. They never attended meetings, and made no business decisions. Rather, they submitted to their father's orders and agenda, and even left their father's office when ordered out. Furthermore, they made no effort to pledge the shares, or even to claim ownership of them, prior to the events immediately before this lawsuit. *See* DX 1071–78. Daniel on one occasion in October 1971 wrote to his father, in an effort to obtain delivery, that the certificates in three of the four corporations at issue were "in your name." DX 1011. On several occasions between 1976 and 1982 Ralph proposed changes in the operation of the business, each time assuring his father that his suggestions "would pertain only to the management and not to ownership" of the business. DX 1012, 1017, 1114, 1027, 1031. Finally, Daniel, Ralph, and Ruth each completed several stock powers in blank many years ago at their father's request. The Colonel testified that he obtained these powers because he feared his children might attempt to convert his testamentary plan into ownership claims and that his children knew that he wanted to be able to change any gift he had made them into gifts directly to their children. Tr. 861, 932.

Plaintiffs' lack of involvement in the corporate defendants' affairs establishes only their realization that their father had retained control. They were given, and accepted, beneficial ownership of the shares. When the Colonel told them he had given them shares, they thanked him. When he arranged to issue them dividends, they cashed the checks they received, and declared the sums on their tax returns. If the Colonel is to be believed, his sons' problem is their eagerness to receive his wealth, not their reticence. While they readily conceded control, they have at all appropriate occasions persisted in claiming ownership, as this suit reflects. Daniel's 1971 letter was, as he claimed, an unintended mischaracterization; he meant that his father controlled the corporations and that insofar as the public was concerned they were in the Colonel's name. Ralph most certainly did not intend to suggest in his proposals between 1976 and 1982 that the Colonel owned the corporations; he was simply making clear that ownership was a separate issue from the management issue, which was the subject of his proposals.

The stock power forms, signed in blank, provide no evidence of a failure to accept the gifts. To begin with, if the Colonel in fact asked his children to sign them so he could retransfer the shares, his actions indicate that he regarded the gifts he had made as complete and subject to cancellation only on consent of his children. Furthermore, even if the Colonel attempted thus to reserve the right to take back the shares, his children nevertheless accepted the gifts; his actions would only have made the gifts revocable. The evidence showed, in any event, that the children did not consent to the revocation of the gifts they had received. The Colonel's testimony was unconvincing insofar as he suggested that they so agreed. He was convincing in claiming that they had acquiesced in his transferring any of their stock to their respective children, and both Ruth and Ralph have agreed to such transfers in the past. Tr. 406; DX 1102. But none of his children agreed in signing the certificates to allow the Colonel to act as he chose with what all three have long regarded as their property.

■ A stock power signed in blank authorizes only what the signatory intended to permit, and must be shown to relate to specific stock to be effective. *See, e.g., Larsen v. Long Island Nat'l Bank*, 38

Misc.2d 877–78, 239 N.Y.S.2d 85 (Sup.Ct. Nassau Cy. 1963). The Colonel testified that he simply put the powers before his children and they signed, without any discussion or instruction. Tr. 931–32. This scenario, even if true, would at most authorize the Colonel to act only as a trustee in his childrens' interests. Finally, the Colonel failed to exercise whatever authority may have been conveyed by the powers. The powers remain unexercised, after a period of many years, and were not relied upon by the Colonel in his actual effort to cancel the gifts he made. Indeed, although he initially testified that he had not cancelled his gifts to his grandchildren, he later conceded that he had done so, even though they signed no stock powers authorizing him to take back or transfer their shares. Tr. 927–30.

### D. *Implied Trust or Retained Life Interest.*

 The question remains whether Colonel Elyachar could effectively withhold delivery of the power to control the corporate interests reflected by the certificates. Two equally plausible bases exist for upholding this effort on his part. First, nothing in property law prevents an owner from separating beneficial ownership from control. A person can convey an ownership interest in personal property—in effect the remainder interest—along with the right to receive all income or profits, while at the same time retaining a life interest in its use or control. "Not only may the donor defer the enjoyment of the donee until the death of the donor, but he may also reserve to himself the use and enjoyment of the property during his life without affecting the present character of the gift to the donee of the future enjoyment or invalidating the donation." Brown, *The Law of Personal Property* § 48, at 134 (2d ed. 1936); *see, e.g., In re Estate of Valentine,* 122 Misc. 486, 204 N.Y.S. 284 (Sur.Ct. N.Y.Cy.1924) (donor effectively made gift of ownership of stock upon his death to his wife and daughters by delivering document proving absolute gift, despite reservation of control and income for donor's life); *In re Estate of Hendricks,* 163 A.D. 413, 148 N.Y.S. 511 (1st Dep't 1914), *aff'd,* 214 N.Y. 663, 108 N.E. 1095 (1915) (gift of beneficial ownership in stock upheld, though voting power and control reserved); *In re Estate of Bullard,* 76 A.D. 207, 78 N.Y.S. 491 (3rd Dep't 1902) (gift upheld where donor transferred stock certificates to his grandson, but retained control, dividends, and voting power and held office for long periods by virtue of stock control).

Dividing the incidents of property in the manner contemplated by Colonel Elyachar is uncommon with respect to some forms of property, but entirely familiar in connection with ownership interests in corporations. The separation of ownership and control in corporate affairs is the rule rather than the exception in our economy, and stock ownership is often unaccompanied by meaningful authority other than the right to a due proportion of such payments as the corporate directors choose to order. W. Cary & M. Eisenberg, *Corporations* 208–11 (5th ed. 1980). The analogy to this case is obviously imperfect, but it is advanced here only to show that the Colonel's plan sought an allocation of property interests that is far from unusual in our society. In light of the Colonel's lifetime involvement with his buildings, moreover, his plan to give away interests in them, while retaining control, is an allocation of ownership interests that advances reasonable economic expectations in a manner consistent with property law principles.

 The Colonel's plan can also be upheld as an intervivos trust, in which he gave beneficial ownership of the shares to his children, while retaining physical possession of the certificates as trustee for his life or for such shorter period as he elected. A trust is "a fiduciary relationship in which one person holds a property interest, subject to an equitable obligation to keep or use that interest for the benefit of another." G. Bogert, *The Law of Trusts & Trustees* § 1 (2d ed. 1965). Usually the settlor delivers the trust res to a trustee pursuant to a written document describing the transfer. But a trust may be estab-

lished through an oral declaration or other conduct, even though the settlor does not use the words "trust" or "trustee":

> Although a trust is created only if the settlor properly manifests an intention to create a trust, it is immaterial whether or not he knows that the relationship which he intends to create is called a trust, and whether or not he knows the precise characteristics of the relationship which is called a trust. In many cases the owner of property in disposing of it has no very clear idea of the precise nature of the disposition which he intends to make.

1 *Scott on Trusts* § 23, at 191 (3d ed. 1967).

In New York a trust in personal property can be created or proved by parol, and no requirement exists that particular words be used. "The law will delineate a trust where, in view of a sufficiently manifested purpose or intent, that is the appropriate instrumentality, even though its creator calls it something else, or doesn't call it anything." *In re Will of Douglas*, 195 Misc. 661, 665, 89 N.Y.S.2d 498, 503 (Sur.Ct. Broome Cy.1949); *see* 61 N.Y.Jur. *Trusts* § 57 (1968) ("the court will find that a trust is created where it appears that such was the intention of the parties, and where the nature of the transaction justifies or requires it"). To protect the alleged donor, however, New York law requires that his intent to create a trust must be established beyond any reasonable doubt. The words and acts relied upon must be unequivocal in nature and admit of no other interpretation than that the property was to be held in trust. There must be either an express declaration of trust or facts and circumstances which show that the putative settlor intended to create a trust relationship. *In re Estate of Fontanella*, 33 A.D.2d 29, 31, 304 N.Y.S.2d 829, 831 (3d Dep't 1969) (beyond reasonable doubt); *Beaver v. Beaver*, 117 N.Y. 421, 428, 22 N.E. 940, 941 (1889).

In this case the Colonel's intention to create a trust is "implied from [his] acts or words ... [and] arises as a necessary inference therefrom and is unequivocal." *Wadd v. Hazelton*, 137 N.Y. 215, 219, 33 N.E. 143, 144 (1893). His acts and words established his intention to give beneficial ownership, presently and absolutely, to those in whose names he issued certificates and to whom he paid dividends as shareholders. At the same time, his acts and words also established his intention to retain the power to control the corporations involved. These intended objectives strongly indicate a desire on his part to manage the property for the ultimate benefit of the beneficial owners. Furthermore, his conduct until his recent attempt to repudiate the gifts was entirely consistent with that of a trustee. He paid out all dividends to the beneficial owners, and when his sons protested his attempt to withhold a dividend, he acquiesced and paid the dividend declared. Some years before this litigation, Daniel instinctively described the nature of his interest in the corporations when he stated in a financial report that "[n]o New York Property has been included in this Statement, as it is involved with a large Family Trust, presently controlled by father, J.R. Elyachar." DX 1071; *see* Tr. 496.

The rule requiring proof beyond a reasonable doubt of an intention to create a trust has been satisfied here, if trusts may truly be implied from conduct without regard to form. To the extent any doubt exists, moreover, the rule must be applied with a view to its purpose rather than in a mechanical manner. That purpose is to avoid the instability to titles and the danger of perjury that would occur if courts could convert imperfect gifts into valid declarations of trust. *See Young*, 80 N.Y. at 437; *see also Hamer v. Sidway*, 124 N.Y. 538, 27 N.E. 256 (1891); *Tsai v. Tsai*, 39 A.D.2d 652, 331 N.Y.S.2d 691, 692 (1st Dep't 1972); *Fontanella*, 33 A.D. at 31, 304 N.Y.S.2d at 831. To apply the rule here, and thereby to invalidate the trust, would serve no such purpose. The gifts made by Colonel Elyachar were intended, delivered, and accepted so they have become present and irrevocable. A trust is implied in this case not to save a future or revocable gift but to give

effect to the Colonel's equally clear intent to reserve to himself powers of management and control, powers that would be lost under these circumstances if no trust (or life interest) were implied. The dangers of fraud and perjury that exist when purported donees claim they were delivered property in trust are therefore not present in this case. While the situation is apparently one of first impression, it appears reasonable to assume that the courts of New York would more readily find a trust in order to effectuate a donor's intent to reserve a property interest than to render complete at a donee's behest an intended but undelivered gift.

### IV. *Conclusion*

In light of the findings and conclusions recited above, Daniel and Ralph Elyachar are each hereby declared the beneficial owners of 20% of the outstanding shares of Gerel Corporation, 20% of the outstanding shares of Huguel Corporation, 20% of the outstanding shares of Timston Corporation, and 21.9% of the outstanding shares of Ruradan Corporation. Defendants are ordered to prepare the necessary documents and certificates properly to reflect plaintiffs' interests, which must be accomplished within thirty days of the entry of final judgment in this case, after all appeals are exhausted. Colonel Elyachar will continue to manage and control these corporations for his life, as fiduciary or trustee for the beneficial owners. The request that the certificates be surrendered to plaintiffs is therefore denied. The Court retains jurisdiction to enforce this judgment through appropriate proceedings and decrees.

SO ORDERED.