**In re M. FABRIKANT & SONS, INC., et al., Debtors.**

**No. 06–12737(SMB).**

United States Bankruptcy Court, S.D. New York.

April 9, 2008.

119. *See* 74 F.3d at 1367, third change.

Troutman Sanders LLP, Mitchel H. Perkiel, Esq., Lee W. Stremba, Esq., Paul H. Deutch, Esq., of Counsel, New York, NY, for the Debtors.

Kramer, Levin, Naftalis & Frankel LLP, Philip Bentley, Esq., David M. Feldman, Esq., Matthew K. Kelsey, Esq., of Counsel, New York, NY, for Wilmington Trust Company.

Moses & Singer LLP, Alan Kolod, Esq., Lawrence L. Ginsburg, Esq., Christopher Gresh, Esq., Christopher J. Caruso, Esq., of Counsel, New York, NY, Halperin, Battaglia, Raicht LLP, Christopher J. Battaglia, Esq., Ethan D. Ganc, Esq., of Counsel, New York, NY, Conflicts Counsel to the Official Committee of Unsecured Creditors.

Hahn & Hessen LLP, Steven J. Mandelsberg, Esq., Joshua I. Divack, Esq., Of Counsel, New York, NY, for JPMorgan Chase Bank N.A.

Cadwalader, Wickersham & Taft LLP, Evan R. Fleck, Esq., Gregory M. Petrick, Esq., of Counsel, New York, NY, for ABN Amro Bank N.V.

Reimer & Braunstein LLP, Paul S. Samson, Esq., Jeffrey D. Ganz, Esq., of Counsel, Boston, MA, for Bank of America, N.A.

Phillips Lytle LLP, William J. Brown, Esq., Allan L. Hill, Esq., of Counsel, New York, NY, for HSBC Bank USA.

Herrick, Feinstein LLP, Andrew C. Gold, Esq., Frederick E. Schmidt, Esq., of Counsel, New York, NY, for Bank Leumi.

Heller Ehrman LLP, Timothy Mehok, Esq., of Counsel, New York, NY, for Israel Discount Bank of New York.

Milbank, Tweed, Hadley & McCloy LLP, Douglaw W. Henkin, Esq., Wilbur F. Foster, Jr., Esq., of Counsel, New York, NY, for Sovereign Precious Metals LLC and Sovereign Bank.

Office of the U.S. Trustee, Alicia Leonhard, Esq., of Counsel, New York, NY, for the U.S. Trustee.

## MEMORANDUM DECISION AND ORDER OVERRULING OBJECTIONS TO CONFIRMATION OF THE PLAN

STUART M. BERNSTEIN, Chief Judge.

The debtors, the Official Committee of Unsecured Creditors (the "Committee") and Wilmington Trust Company, as collateral and administrative agent for a group of secured lenders (the "Current Lenders," and together with the debtors and the Committee, the "Plan Proponents"), jointly proposed a plan of reorganization (the "Plan"). The assignors of the Current Lenders' claims (i.e., the "Original Lenders") objected to the Plan,[1] as did Sovereign Bank, both an Original Lender as well as the putative holder of a separate claim (the VSI Guaranty, described below). The substance of the objections centered on certain reimbursement rights (the "Reimbursement Rights") granted to the Original Lenders under the final cash collateral order entered in this case.

The Original Lenders subsequently assigned their rights to the Current Lend-

---

1. Two Original Lenders, ABN Amro Bank N.V. ("ABN") and Antwerpse Diamantbank, N.V. ("ADB"), did not object to confirmation, but nevertheless asserted the same claims that underlay the Original Lenders' objections.

ers. The principal dispute is whether the assignments also transferred the Reimbursement Rights. In addition, Sovereign Bank contends that it still holds the Reimbursement Rights in connection with the VSI Guaranty, which was never assigned. For the reasons that follow, the objections are overruled.

## FACTS

### A. The Original Lenders

M. Fabrikant & Sons, Inc. ("MFS"), established in 1895, was one of the world's largest manufacturers and distributors of diamonds. MFS is a privately held New York corporation, and owns 81% of Fabrikant–Leer International, Ltd. ("FLI"), also a New York corporation. MFS and FLI are the debtors in these chapter 11 cases. In the course of their business, the debtors entered into separate loans or financial arrangements with the Original Lenders, a group that included ABN, ADB, Bank of America, N.A. ("BOA"), Bank Leumi USA ("BL"), HSBC Bank USA, National Association ("HSBC"), Israel Discount Bank of New York ("IDB"), JPMorgan Chase Bank, N.A. ("JPMorgan"), Sovereign and Sovereign Precious Metals LLC ("SPM"). In each case, the debtors granted the Original Lender a security interest in their assets to collateralize the loan.

In an entirely separate transaction in February 2004, MFS guarantied the obligations of its subsidiary, Vision, Solutions, Impact, LLC, to Sovereign (the "VSI

Guaranty"). The VSI Guaranty was unsecured.[2]

### B. The Amended and Extended Security Agreements[3]

On January 13, 2006, MFS and the Original Lenders (except for Sovereign) entered into the Second Amended and Restated Security Agreement ("January 2006 Agreement").[4] The January 2006 Agreement was intended "[t]o secure the prompt, complete and unconditional payment and performance to Agent [JP Morgan, as collateral agent] and each of the Creditors of the Borrower's Obligation." (*January 2006 Agreement*, at ¶ 3(a).) "Borrower's Obligations" meant

> each and every obligation, liability and indebtedness of any kind or character whatsoever, whether now existing or hereafter incurred, direct or indirect, absolute or contingent, matured or unmatured of Borrower hereunder to Agent or to any Creditor pursuant to any Loan Agreement or the Borrower Guaranties, or otherwise.

(*Id.*, at ¶ 2(a).) The "Borrower Guaranties" meant "the Guaranties dated as of January 13, 2006, on behalf of each of BL and ABN by which Borrower has guaranteed FL's obligations to BL and ABN." (*Id.*) As noted, Sovereign was not a party to, beneficiary of, or "Creditor" under, the January 2006 Agreement, and remained unsecured.

Sovereign's status changed in July 2006. MFS and BankBoston, N.A. had entered

---

2. The VSI Guaranty provided by Sovereign was undated and unsigned. No party contested its validity. I assume, therefore, that MFS actually signed the VSI Guaranty and delivered it to Sovereign.

3. These documents were discussed by the Original Lenders and the Plan Proponents in their submissions. Copies of the documents are attached as Exhibits B through H to the

*Declaration of Robert R. Miller in Support of Sovereign Precious Metal LLC's Motion to Dismiss the Complaint*, dated Dec. 10, 2007 (Adv. Pro.# 07–2780)(ECF Doc. # 34).

4. The same creditors entered into a similar agreement with FLI. (*See Security Agreement*, dated Jan. 13, 2006.)

into a consignment agreement in 1988 (the "Consignment Agreement"). (*Amended and Restated Consignment Agreement,* dated Dec. 31, 1998, at 1.) The Consignment Agreement was amended several times over the next 20 years, and its purpose was to enable MFS to buy precious gems from SPM or one of its predecessors. (*Objection Of Sovereign Precious Metals, LLC And Sovereign Bank To Confirmation Of Proposed Joint Plan Of Liquidation,* dated Dec. 7, 2007, at ¶ 1)("*Sovereign Objection*") (ECF Doc. # 528); *see* (*Amended and Restated Consignment Agreement,* at 1.) Sovereign eventually succeeded to the interests of BankBoston, and assigned its rights to SPM. (*Eighth Amendment to Amended and Restated Consignment Agreement Dated as of December 31, 1998,* dated July 7, 2006 ("*Eighth Amendment*"), at 1). Pursuant to a secured demand note dated July 7, 2006 (the "Sovereign Note"), Sovereign loaned MFS $33 million to repurchase 50,-760 fine troy ounces of gold from SPM. (*Eighth Amendment,* at § 2.) MFS reaffirmed the security interest that it had granted to SPM under the January 2006 Agreement; SPM assigned those rights to Sovereign; and the parties acknowledged that Sovereign was substituted for SPM as a secured lender under the January 2006 Agreement. (*Id.,* at § 4.)

On the same day, MFS, the Creditors under the January 2006 Agreement and Sovereign entered into the Joinder to Security Agreements, dated as of July 7, 2006 ("Sovereign Joinder"). The Sovereign Joinder brought Sovereign into the family of Original Lenders. It did not mention the Consignment Agreement, the Sovereign Note, the VSI Guaranty, or any specific MFS debt. Instead, the parties acknowledged in the "Background" section that

[p]ursuant to certain agreements or documents with or between the Borrower [MFS] and Sovereign, Sovereign has agreed to provide financial accommodations to the Borrower. As security for such financial accommodations, each Credit Party desires to grant a security interest in its respective Collateral to the Agent for the benefit of Sovereign. Upon the terms and conditions set forth herein, each of the Credit Parties and the Creditors agree to having Sovereign become a Creditor under each Security Agreement.

(*Sovereign Joinder,* at 2.)

Accordingly, the parties stipulated that

Sovereign shall be and become, for all purposes a Creditor under the Borrower Security Agreement and the FL Security Agreement, and all references to "Creditor" and "Creditors" under each Security Agreement shall be deemed to include as of such date Sovereign. Notwithstanding the foregoing, the parties hereto acknowledge that Sovereign did not have a security interest in the Collateral prior to the Effective Date.

(*Id.,* at ¶ 2(a).)

## C. The FCCO

The debtors filed their chapter 11 petitions on November 17, 2006. On December 18, 2006, the Court entered the Final Order Authorizing Debtors' Use of Cash Collateral and Granting Adequate Protection Claim and Lien ("FCCO")(ECF Doc. # 93). According to the FCCO, the debtors owed the Original Lenders $161,945,000 (the "Pre–Petition Obligations"), the Pre–Petition Obligations were secured by the "Pre–Petition Collateral," and the Original Lenders agreed to allow the debtors to use the "Pre–Petition Collateral" and any cash collateral in accordance with the terms of the FCCO. (*FCCO,* at 6.) All of the covenants, terms and conditions constituted adequate pro-

tection for the use of "Pre–Petition Collateral," even if they were not specifically denominated as "adequate protection." (*Id.*, at ¶ 2.)

The FCCO granted the Original Lenders specific adequate protection in the form of an "Adequate Protection Claim" to cover the diminution in the value of their "Pre–Petition Collateral." (*Id.*, at ¶ 3.) It also granted an "Adequate Protection Lien" to secure the "Adequate Protection Claim". (*Id.*, at ¶ 4.) Finally, although not denominated adequate protection, the FCCO granted the Reimbursement Rights at issue in this dispute. Paragraph 10 stated in relevant part:

> In addition to the fees, costs, charges and expenses authorized under the Pre–Petition Agreements, the Debtors shall pay in accordance with the procedures set forth in the following sentences, as allowed post-petition administrative expenses entitled to the priority and security afforded to the Adequate Protection Claim, all of Collateral Agent's and each Lender's reasonable (in all respects) attorneys' and other professionals' fees and reimbursable expenses arising from or related to (a) this Order, including without limitation the negotiating, closing, documenting and obtaining of Court approval thereof, (b) all proceedings in connection with any Disposition (as such term is defined below), (c) all proceedings in connection with the interpretation, amendment, modifi-

cation, enforcement, enforceability, validity or implementation of the Pre–Petition Agreements or this Order at any time, (d) all other matters and proceedings arising in or related to the Debtors' bankruptcy cases, and (e) all reasonable expenses, costs and charges in any way or respect arising in connection with the foregoing (collectively, the "Lender Expenses").

## D. The Assignments[5]

Beginning shortly before the entry of the FCCO and continuing through February 2007, each of the Original Lenders transferred their secured claims and security interests to the Current Lenders.[6] Each Original Lender entered into a transfer agreement with its respective transferee (collectively, the "Transfer Agreements"). Each Transfer Agreement identified a specific obligation, usually by reference to a particular credit agreement, note or loan. None listed the FCCO as a "Credit Document." The Transfer Agreements incorporated the Purchase and Sale Agreement for Distressed Trades, LSTA Standard Terms and Conditions (the "Standard Terms and Conditions") in form or in substance. While the language in the several Transfer Agreements varied, all parties agree that the relevant portions of the Standard Terms and Conditions, and in particular, the scope of the assigned rights, are substantially similar under each

---

5. The Court directed the Original Lenders to provide copies of documentation relating to the assignments. All but ADB complied, and the documents were received into evidence at the December 21, 2007 hearing as Wilmington Exhibits ("WX") 1 through 7. (Transcript of hearing, held Dec. 21, 2007, at 9)("12/21 Tr.")(ECF Doc. # 602.) ADB submitted its documentation after the hearing, and it was never formally received in evidence. The omission was harmless, and does not affect the disposition of the dispute. Its transfer documentation was substantially similar to

the documentation submitted by the other Original Lenders.

6. I assume for the purpose of this opinion that the assignments to the Current Lenders took effect after the date of the FCCO. If an Original Lender transferred *its* claims and liens before then, and had no interest in the "Pre–Petition Collateral" at the time of the FCCO, it was not entitled to the benefits of the FCCO.

assignment. (*Compare Joint Memorandum In Opposition To Confirmation submitted by the Original Lenders*, dated Jan. 4, 2008 (the "*Original Lenders' Memo*"), at 3 n. 7 (ECF Doc. # 570)("Although the Original Lenders' agreements incorporated different versions of the Standard Terms and Conditions, the relevant portions of the Standard Terms and Conditions are substantially similar.") *with Memorandum of Law of Plan Proponents, (A) In Support of Plan Proponents' Oral Motion Seeking to Estimate the Asserted Administrative Claims of the Original Lenders at Zero; (B) Responding to Joint Memorandum in Opposition to Confirmation; and (C) Responding to the Letter of Sovereign Entities Asserting a Claim*, dated Jan. 14, 2008, at 5–6 n. 5 (ECF Doc. # 578)("The BOA Transfer Document varies slightly from the other Transfer Documents [substituting 'Loans' for 'Transferred Rights,' but is] substantially similar to the definition of 'Transferred Rights' set forth above.").)

The Standard Terms and Conditions provided that the "Seller irrevocably sells, transfers, assigns, grants and conveys the Transferred Rights to Buyer." (*Standard Terms and Conditions*, § 2(a), at 7 (effective Dec. 1, 2006).) The "Transferred Rights" included, *inter alia*,

> any and all of Seller's right, title, and interest in, to and under the Loans and Commitments (if any) and, to the extent related thereto, the following (*excluding, however*, the Retained Interest, if any)
> . . . .
> (e) all claims (including "claims" as defined in Bankruptcy Code Section 101(5)), suits, causes of action, and any other right of Seller ... that is *based*

upon, arises out of or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, ...) suits, causes of action, and any other right of Seller ... against any attorney, accountant, financial advisor, or other Entity *arising under or in connection with the Credit Documents or the transactions related thereto or contemplated thereby* ....

(*Id.*, § 1.2, at 6–7)(emphasis added).

The Standard Terms and Conditions carved out only one group of rights—the "Retained Interest"—from the broad definition of "Transferred Rights":

> "Retained Interests" means, if "Settled Without Accrued Interest" is specified in the Transaction Specific Terms, the right retained by Seller to receive, in accordance with the provisions of Section 8.3, payments or other distributions, whether received by setoff or otherwise, of cash (including interest), notes, securities or other property (including Collateral) or proceeds paid or delivered in respect of the Pre–Settlement Date Accruals or the Adequate Protection Payments (if any); *provided* that Retained Interest shall not include any PIK Interest.

(*Id.*, § 1.2, at 5.) "Adequate Protection Payments" meant, with respect to the "Transferred Rights," amounts (other than "PIK Interest") ordered to be paid by the Bankruptcy Court as adequate protection under an "Adequate Protection Order"[7] for the loans and obligations owed under the "Credit Agreement" "that accrue during the period before (but excluding) the

---

7. "Adequate Protection Order" meant "any order of the Bankruptcy Court authorizing or ordering Borrower or any Obligor to make adequate protection payments to the Lenders, including any adequate protection order specifically identified in the Annex." (*Standard Terms and Conditions*, § 1.2, at 1.)

earlier of (a) the Settlement Date and (b) T+20."[8] (*Id.*, § 1.2, at 1.) Finally, the seller of the claim agreed to indemnify the buyer, and also pay the buyer's attorneys' fees and expenses, if the buyer was forced to disgorge or reimburse any payments or property received by the seller in connection with the "Transferred Rights," or any other claim that the seller might have against the borrower or obligor. (*See id.*, § 6.1(a) & (b), at 17–18.)

Sovereign assigned the Sovereign Note, but did not assign the VSI Guaranty. (*See* WX 5.)

### E. The Adversary Proceeding

Subsequent to the assignments and the entry of the FCCO, on October 1, 2007, the Committee commenced an adversary proceeding in this Court against the Original Lenders, entitled (*Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. and Fabrikant–Leer Int'l, Ltd. v. JP Morgan Chase Bank, N.A., et al.*, Adv. Pro. No. 07–2780)(the "Adversary Proceeding").[9] The Committee seeks, among other things, to avoid the obligations and security interests that the Original Lenders transferred to the Current Lenders, and recover the value of the transferred security interests for the benefit of the estates. The Committee maintains that it could have asserted the same claims against the Current Lenders, but did not because the Committee and the debtors reached a settlement with the Current Lenders that is incorporated into the Plan. (*See Third Amended Disclosure Statement for Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code of the Plan Proponents*, dated Nov. 7, 2007, at 22–24) (*"Disclosure Statement"*)(ECF Doc. # 458.)

The Original Lenders have vigorously defended the Adversary Proceeding.[10] In the process, they have incurred and will continue to incur substantial legal fees and expenses that, they contend, are covered by the Reimbursement Rights they claim to hold. They also filed administrative claims to recover their actual attorneys' fees and expenses to date, plus estimated future fees and expenses.

### F. The Plan

The Court approved the Disclosure Statement by order dated November 7, 2007, (ECF Doc. # 459), and conducted the confirmation hearing on December 19 and 21, 2007. The Original Lenders objected to confirmation of the Plan[11] on several grounds centering on the administrative claim status of their alleged Reimbursement Rights. They contended that (i) the Plan violated the priority of distribution under section 1129(a)(9)(A) by failing to provide for the payment in full of their Reimbursement Rights; (ii) the Plan failed to separately classify their Reimbursement Rights and specify their treatment; (iii) their Reimbursement Rights were impaired under the Plan; and (iv) the treatment of their Reimbursement Rights was not fair and equitable under section 1129(b)(1) and (b)(2) of the Code because

---

**8.** "T + 20" meant "the date that is twenty (20) Business Days after the Trade Date." (*Id.*, § 1.2, at 6.)

**9.** The Committee did not name Sovereign. The Committee contends that this was a mistake, and has filed an amended complaint that adds Sovereign as a defendant. This opinion assumes for the purpose of discussion that all of the Original Lenders are defendants. This assumption does not affect the disposition.

**10.** The Original Lenders have moved to dismiss the complaint. That motion will be the subject of a separate opinion.

**11.** *See supra* note 1.

the Plan did not contemplate the establishment of a reserve to pay them. (*See, e.g., Sovereign Objection,* at 4–7.)

The Court conducted an evidentiary hearing on the other confirmation issues on December 19, 2007, and scheduled a trial to hear the Original Lenders' objections for December 21, 2007. (Transcript of hearing, held Dec. 19, 2007, at 47)("12/19 Tr.")(ECF Doc. # 601.) The Court also scheduled the continuation of the hearing pertaining to a separate objection that the Plan did not satisfy the "best interests" test. *See* 11 U.S.C. § 1129(a)(7).[12]

Neither the Original Lenders nor the Plan Proponents called witnesses at the continued hearing. Instead, they submitted copies of the Transfer Agreements and pertinent documents and orders, including the FCCO.

## DISCUSSION

■ The disputes in this matter center on the interpretation of the parties' various contracts. When faced with such questions, the primary objective is to give effect to the parties' intent. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094 (2d Cir. 1993); *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). Where the parties' intent is not plain from the language they used, a court may look to the objective manifestations of intent gathered from the parties' words and deeds. *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.,* 41 N.Y.2d 397, 393 N.Y.S.2d 350, 361 N.E.2d 999, 1001 (1977); *Nycal Corp. v. Inoco PLC,* 988 F.Supp. 296, 301 (S.D.N.Y.1997). "The secret or subjective intent of the parties is irrelevant." *Klos v. Polskie Linie Lotnicze,* 133 F.3d 164, 168 (2d Cir.1997).

### A. The Assignments

#### 1. The Transfer Agreements

■ Each of the Original Lenders assigned, *inter alia,* "all claims (including 'claims' as defined in Bankruptcy Code Section 101(5)), suits, causes of action, and any other right of Seller or any Prior Seller, whether known or unknown ... arising under or in connection with the Credit Documents or the transactions related thereto or contemplated thereby." Under § 101(5)(A), "claim" means a

> right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

This broad definition was intended to reach all legal obligations, no matter how remote, and deal with them in the bankruptcy case. H.R. REP. NO. 95–595, at 309 (1977); S. REP. NO. 95–989, at 21 (1978); *see Ohio v. Kovacs,* 469 U.S. 274, 279, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985)("it is apparent that Congress desired a broad definition of a 'claim' "); *United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1003 (2d Cir.1991)("Congress unquestionably expected this definition [of a claim] to have wide scope.").

■ The Reimbursement Rights satisfy this broad definition. At the time of the assignments, they represented contingent rights to indemnity that arose under the FCCO. "Under contract law, a right to payment based on a written indemnification contract arises at the time the indemnification agreement is executed." *Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prods. Corp.),* 209 F.3d 125, 129 (2d Cir.2000). The FCCO is not a contract, but nonetheless bears the hallmarks of one. Such orders are heavily negotiated among all of the parties in in-

---

**12.** The Court overruled this objection from the bench following the close of the evidence.

terest, and are akin to court-approved stipulations. In any event, the right to reimbursement under the FCCO arose prior to the assignments.

The Reimbursement Rights are also "related" to, and arose "in connection with the Credit Documents or the transactions related thereto or contemplated thereby." The Reimbursement Rights, along with the other adequate protection, were granted under the FCCO in exchange for the debtors' use of the Original Lenders' cash and other "Pre–Petition Collateral." The Original Lenders' interests in the "Pre–Petition Collateral" arose by virtue of and in connection with the "Credit Documents." Furthermore, the Original Lenders do not dispute that the other adequate protection rights provided in the FCCO— the "Adequate Protection Claim," the "Adequate Protection Lien," as well as the rights to monitor the loans and the collateral, call a default and, where necessary and appropriate, seize the collateral—were transferred to the Current Lenders. Accordingly, the Reimbursement Rights plainly fall within the scope of the "Transferred Rights."

■ The Original Lenders have offered several reasons why the broad language of the Transfer Agreements should nonetheless be read to exclude the Reimbursement Rights. First, they contend that "claims" under the Bankruptcy Code are limited to pre-petition rights to payment, and the Reimbursement Rights arose post-petition. The definition of "claim" does not, however, distinguish between pre- and post-petition rights. Accordingly, the Bankruptcy Code uses qualifying language when the intent is to limit a provision to pre-petition claims. For example, a "creditor" is one

that "has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A).[13] Similarly, the automatic stay prohibits the commencement or continuation of an action "to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). Finally, the section 727(b) discharge only extends to debts (i.e., the "liability on a claim," 11 U.S.C. § 101(12)) "that arose before the date of the order for relief." The Original Lenders' interpretation of "claim" renders most if not all of the limiting language in these provisions superfluous, and violates the maxim that statutes should not be interpretated in a manner that renders any word or provision superfluous. See Hibbs v. Winn, 542 U.S. 88, 89, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004); Doe v. Chao, 540 U.S. 614, 630–31, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004); see generally 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 46:6 at 230–52 (7th ed.2007).

In addition, other provisions in the Bankruptcy Code expressly refer to post-petition "claims." For example, section 348(d) deals with "[a] claim against the estate or the debtor that arises after the order for relief" but before an order of conversion. Section 502(f) addresses "claims" that arise after the commencement of the case but before the appointment of a trustee or the entry of an order for relief in an involuntary case (i.e., "gap claims"). Section 1129(a)(9)(A) states, in substance, that the chapter 11 must provide for the payment of post-petition administrative and involuntary gap "claims" on the effective date of the plan. Section

---

13. The commencement of a voluntary case constitutes an "order for relief." 11 U.S.C. § 301(b). Except in the case of involuntary petitions, date of the order for relief and the petition date are the same. In addition, an order converting a case to another chapter constitutes an order for relief. 11 U.S.C. § 348(a).

1171(a) grants a priority to certain claims, "whether such claim arose before or after the commencement of the case." Finally, the chapter 11 confirmation order discharges "any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). By definition, the confirmation occurs after the commencement of the case. These are but a few examples of instances in which the Bankruptcy Code expressly recognizes post-petition "claims."

It is true, as the Original Lenders point out, that some decisions equate "claims" with pre-petition rights to payment. *E.g., LTV Steel Co., Inc. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 497 (2d Cir.1995)("However broadly claim is understood, it is clear that the existence of a valid bankruptcy claim depends on ... whether that right arose before the filing of the petition."); *Federated Dept Stores, Inc. v. Wongco (In re R.H. Macy & Co., Inc.)*, 236 B.R. 583, 589 (Bankr.S.D.N.Y. 1999)(same), *affd.*, 283 B.R. 140 (S.D.N.Y. 2002), *affd.*, 67 Fed.Appx. 30 (2d Cir.2003). These and similar cases are concerned with when the right to payment arose, and typically implicate the discharge provisions of the Bankruptcy Code or the deadline for filing a pre-petition claim under a bar date order. They do not support the rule that notwithstanding the language of the Bankruptcy Code, the definition of "claim" is limited to a pre-petition right to payment.[14]

Rather, the plain language of the Bankruptcy Code demonstrates that a "claim" includes a post-petition as well as pre-petition right to payment.

Finally, the "Transferred Rights" included all claims, not just "claims" as defined in the Bankruptcy Code. Thus, the reference to the Bankruptcy Code definition did not limit the transfer to bankruptcy "claims." The only right excepted from the definition of "Transferred Rights" was the "Retained Interest." At most, the "Retained Interest" included adequate protection payments that accrued during the earlier of the Settlement Date and 20 days after the "Trade Date." Both dates passed long before the Committee commenced the Adversary Proceeding, and the Original Lenders started to incur litigation expenses.

The Original Lenders also point out that certain language in the Transfer Agreements implied that the Original Lenders did not intend to transfer the Reimbursement Rights. For example, the FCCO is not a "Credit Document" under the Standard Terms and Conditions. In addition, the Standard Terms and Conditions distinguished between "Transferred Rights" and "Credit Agreements" on the one hand, and "Adequate Protection Orders" and "Adequate Protection Payments" on the other. (*Original Lenders' Memo*, at 3–5.)

---

**14.** The Second Circuit commented on the inconsistency between the language of the Bankruptcy Code and its decision in *Chateaugay* in *Manville Forest Products Corp.* There, Riverwoods predecessor entered into two prepetition agreements to indemnify Olin. Riverwood subsequently filed a chapter 11 petition, but Olin failed to file a proof of claim prior to the deadline applicable to pre-petition claims. Following confirmation, Olin incurred environmental clean-up costs, and demanded indemnification from Riverwood. The issue was whether the right of indemnification arose pre-petition, and was barred by the confirmation discharge. The Court observed:

We see an inconsistency between the wording of the Bankruptcy Code, which discharges debt arising before the *confirmation* date, and our statement in *LTV Steel Co. (In re Chateaugay Corp.)* that the discharged debt must arise before the *filing* date. However, we need not resolve that point here, because (as discussed below) Olin's claims did in fact arise pre-petition. Chronologically, Olin's claims necessarily arose pre-confirmation as well.

209 F.3d at 128 n. 1; *accord West v. Worldcom, Inc. (In re Worldcom, Inc.)*, No. 06 Civ. 0748(WHP), 2007 WL 3407060, at *2 n. 1 (S.D.N.Y. Nov.14, 2007.)

These examples do not affect my conclusion. The Transfer Agreements contained an all-encompassing assignment of rights. The transfers were not limited to the specific loan documents, and included claims, causes of action, etc. "arising under or in connection with the Credit Documents or the transactions related thereto or contemplated thereby." Thus, it is not surprising that the Transfer Agreements mentioned rights arising under different agreements, and where appropriate, dealt with them. For example, the transfer of "Adequate Protection Payments" did not include payments that accrued before the earlier of the "Settlement Date" and "T + 20." This treatment implied that all other "Adequate Protection Payments", including the Reimbursement Rights that had not yet accrued, were transferred.

Next, the Original Lenders emphasize that they could not have intended to transfer the Reimbursement Rights to the Current Lenders while leaving themselves open to a lawsuit by the Committee. (*Original Lenders' Memo*, at 2 n. 5)("It is simply illogical for the Plan Proponents to suggest that the same document that saddles the Original Lenders with defending claims for pre-transfer events assigns away their Reimbursement Rights associated with a successful defense to such claims.") In fact, the Original Lenders posit that the Reimbursement Rights are personal and have value only to them and no value to the Current Lenders. (*Id.*, at 7–8.)

This argument ignores the extent of the Reimbursement Rights granted under paragraph 10 of the FCCO. They are not limited to litigation expenses. Instead, they expressly cover "all proceedings in connection with the interpretation, amendment, modification, enforcement, enforceability, validity or implementation of the Pre–Petition Agreements or this Order at any time," and "all other matters and proceedings arising in or related to the Debtors' bankruptcy cases." The Current Lenders have actively participated in the case, monitoring their loans and collateral and joining as a proponent in the Plan process. They have incurred substantial legal and other fees in the process.

Furthermore, the debtors have regularly reimbursed Wilmington's legal and financial advisory fees and expenses pursuant to paragraph 10 of the FCCO. The Disclosure Statement revealed:

> Wilmington has incurred fees and expenses of counsel and financial advisors in connection with these Cases. Under the Final C/C Order entered by the Court, Wilmington is entitled to have these fees and expenses paid directly by the Estates as part of adequate protection for use of the Current Lenders' collateral, including cash collateral. The Plan Settlement requires that the fees of the professionals representing Wilmington in these Cases that have been incurred but not yet paid be paid prior to the Effective Date of the Plan.[15]

(*Disclosure Statement*, at 6–7; *accord* 12/19 Tr., at 30; Transcript of hearing, held Dec. 21, 2007, at 39)(ECF Doc. # 602).

The Reimbursement Rights are obviously valuable to whoever holds the secured debt during the case, and anyone who reads paragraph 10 of the FCCO would see that.[16] In addition, and but for the

---

**15.** The Disclosure Statement estimated that the estates would have to reimburse Wilmington an additional $450,000 for professional fees incurred in November and December 2007. (*Disclosure Statement*, at 31 n. 13.)

**16.** The Original Lenders discuss and quote from *Chadwick–BaRoss, Inc. v. Martin Marietta Corp.*, 483 A.2d 711 (Me.1984) to support their argument that the Reimbursement Rights were not assigned because they "can

proposed settlement under the Plan, the Current Lenders would be defending the Adversary Proceeding instead of watching from the sidelines. Moreover, the Original Lenders never objected to the reimbursement of Wilmington, as agent for the Current Lenders, or to the quoted passage in the Disclosure Statement. They nevertheless contend that the parties to each Transfer Agreement intended that the Original Lender would keep the Reimbursement Rights. The language in the Transfer Agreements and the parties' course of conduct belie that argument, and the Original Lenders have not offered any credible evidence to support it. Accordingly, the language in the Transfer Agreements encompasses the assignment of the Reimbursement Rights.

### 2. The FCCO

The Original Lenders next turn to the FCCO. Paragraph 22 gave the Committee the right to challenge the Original Lenders' claims and liens, and seek damages, which it eventually did when it commenced the Adversary Proceeding. Paragraph 22 also contained a reservation of rights: "[t]he foregoing is without prejudice to any and all of the Lender Parties' legal and equitable claims, counterclaims, defenses and/or rights of offset and setoff in response to any such Challenge, all of which are reserved." The Original Lenders contend that the Reimbursement Rights are counterclaims that were preserved by paragraph 22.[17] (*Original Lenders' Memo*, at 2 n. 3.)

Even the Original Lenders must concede that they unquestionably transferred

at least some counterclaims. The Transferred Rights included claims and causes of action arising under the "Credit Documents." These claims and causes of action included potential counterclaims, whether permissive or compulsory, that the Original Lenders could have asserted in litigation brought by the Committee. They can no longer assert counterclaims that arose under the Credit Documents because the counterclaims now belong to the Current Lenders. Paragraph 22 did not preserve these counterclaims for the Original Lenders, and they fail to explain why I should read paragraph 22 to preserve some but not all counterclaims, or how I should determine which ones stayed and which ones went. In short, paragraph 22 of the FCCO does not provide any insight into the meaning of the Transfer Agreements.

### 3. Future Rights

■ Lastly, the Original Lenders contend that the Reimbursement Rights were future rights at the time of the transfers that could not be assigned under applicable non-bankruptcy law.[18] This misstates the facts and the law. "[A]n assignment of a right to payment expected to arise out of an existing employment or other continuing business relationship is effective in the same way as an assignment of an existing right." RESTATEMENT (SECOND) OF CONTRACTS § 321(1) (1981); *accord Rockmore v. Lehman*, 129 F.2d 892, 892 (2d Cir.1942)(recognizing that rights that arise from definite contractual obligations may be assigned); *S.E.C. v. Credit Bancorp, Ltd.*, 138 F.Supp.2d 512, 537–38 (S.D.N.Y. 2001)("[W]here there is a contract in place

---

only benefit the defendants in the Adversary Proceeding" (*Original Lenders' Memo*, at 10–11.) As stated in the text, the premise of this argument is incorrect.

**17.** The Original Lenders also refer to paragraph 22's preservation of defenses, but the

Reimbursement Rights have nothing to do with defenses except for possible setoffs.

**18.** New York law governs all of the Transfer Agreements, except one. North Carolina law governs the BOA Transfer Agreement. Neither side has identified a conflict.

governing the rights held by the assignor, even where those rights are conditional or contingent, a valid assignment may be effectuated."), *rev'd on other grounds,* 297 F.3d 127 (2d Cir.2002); *Leon v. Martinez,* 84 N.Y.2d 83, 614 N.Y.S.2d 972, 638 N.E.2d 511, 514 n. 1 (1994)("An assignment may properly relate to a future or conditional right which is adequately identified"). A contingent right under an existing contract is, therefore, assignable.

■ In contrast, "a purported assignment of a right expected to arise under a contract *not in existence* operates only as a promise to assign the right when it arises and as a power to enforce it." RE-STATEMENT (SECOND) OF CONTRACTS § 321(2)(emphasis added). The assignment of a future right nevertheless grants the assignee equitable title with rights superior to the assignors, and the assignee can demand performance from the obligor. JOSEPH M. PERILLO, CALAMARI & PERILLO ON CONTRACTS § 18.9, at 703 (5th ed.2003); *Speelman v. Pascal,* 10 N.Y.2d 313, 222 N.Y.S.2d 324, 178 N.E.2d 723, 725 (1961)(where there was no presently enforceable or existing chose in action at the time of the assignment, but the possibility existed and the parties expected it to ripen into reality which it did, the assignment created an equitable title which the courts would enforce). In short, a future right is also assignable, and may be enforced in a court of equity.

*Saint John Marine Co. v. United States,* 92 F.3d 39 (2d Cir.1996), the Original Lenders' principal authority on this point, did not hold to the contrary, to wit, that the assignment of a future right is unenforceable. There, the plaintiff, a vessel owner, entered into a time charter with Afram. The time charter included a clause that granted the plaintiff a lien in subfreights to secure the payment of Afram's obligations. On the same day, Af-ram entered into a subvoyage charter with the Government. The subvoyage charter would eventually generate subfreights payable to Afram. After Afram defaulted under the time charter, the plaintiff notified the Government of the default and insisted that it pay the subfreights to the plaintiff in accordance with its lien. Instead, the Government paid the subfreights to Afram, and the plaintiff sued the Government to recover the sums owed by Afram. *Id.,* at 41–42.

The issue was whether the plaintiff's lien was an assignment of a claim against the United States barred by the Anti–Assignment Act, 31 U.S.C. § 3727. The Court stated that the lien was inchoate until the vessel owner gave notice to the subvoyage charterer, and could be extinguished before then if the subvoyage charterer paid the subfreight to the charterer prior to receiving notice of the lien. *Id.,* at 47. Turning to section 321 of the Restatement (Second) of Contracts, the Court remarked that the provision of the charter that created the lien was a conditional assignment of the right to receive subfreights if and when (1) Afram entered into a subvoyage charter, (2) the subfreights became due and collectible, and (3) the sums due under the charter also became due. *Id.,* at 47. The Court ruled that the lien on subfreights did not effect an assignment at the time it was created. *Id.*

The Court nonetheless concluded that the lien eventually effected an assignment of an existing claim against the Government. *Id.* Since the assignment occurred by operation of law, it was not subject to the Anti–Assignment Act. *Id.,* at 47–48. Accordingly, the Court affirmed the District Court, enforced the lien against the Government, and required the Government to pay the corresponding portion of the subfreight to the plaintiff after it had paid

it Afram. *Saint John Marine* did not hold that future rights could not be assigned.

In addition, *Saint John Marine* dealt with the assignment of a claim for security purposes. The lien was inchoate until the collateral (the subfreights) and Afram's debt existed, and the lien did not assign anything until then. In contrast, this case involves the absolute assignment of a right to reimbursement under the FCCO. As stated earlier, the right to payment under a written indemnification contract arises when the indemnification agreement is executed. *Manville Forest Prods. Corp.*, 209 F.3d at 129; *Houbigant, Inc. v. ACB Mercantile, Inc. (In re Houbigant, Inc.)*, 188 B.R. 347, 358–59 (Bankr.S.D.N.Y. 1995)("[A] contractual indemnification claim exists as a contingent claim against the indemnitor as of the date the indemnification agreement is executed."). The Reimbursement Rights, though still contingent, existed at the time of the Transfer Agreements, and were assignable.

**B. The VSI Guaranty**

 The foregoing resolves the scope of the assignment, but leaves one open question. The VSI Guaranty was never assigned. Sovereign contends that FCCO also granted Reimbursement Rights to Sovereign in its capacity as the holder of the VSI Guaranty, a capacity it never relinquished. The Plan Proponents counter that the VSI Guaranty was unsecured, the adequate protection granted under the FCCO did not "protect" unsecured creditors, and the debt guarantied by the VSI Guaranty was satisfied in August 2007.

Sovereign's evidence does not support a finding that the VSI Guaranty was secured by the Sovereign Joinder. The Sovereign Joinder did not identify any specific loan or financial accommodation. Nevertheless, it was dated the same day as the Eighth Amendment and the Sovereign Note,

which implies that the Sovereign Joinder was intended to secure the Sovereign Note. Furthermore, the language used in the "Background" section was forward-looking ("Sovereign has agreed to provide financial accommodations to the Borrower"). This language refers to contemporaneous or prospective financial accommodations, not two-year old loans to affiliates. Sovereign did not adduce any evidence at the confirmation hearing that the parties to the Sovereign Joinder also intended to secure the VSI Guaranty. For that matter, Sovereign has not explained why the parties would not have secured the VSI Guaranty in the January 2006 Agreement if that was their intent. Accordingly, I find that the VSI Guaranty was unsecured.

I also find that the Reimbursement Rights did not extend to Sovereign in its capacity as holder of the VSI Guaranty. At the outset, the FCCO did not refer to the VSI Guaranty. The FCCO recited a litany of loans and financial accommodations that added up to $161,945,000 of "Pre–Petition Obligations." (*FCCO*, at 2–6.) As to Sovereign, the FCCO mentioned only the Consignment Agreement, as amended on July 7, 2006, and the loan advanced by Sovereign to allow MFS to purchase the 50,760 fine troy ounces of gold. (*Id.*, at 2–3.) The parties were focused solely on the $33 million secured debt.

Furthermore, the FCCO did not grant any rights to unsecured creditors. The FCCO says: "Collateral Agent and Lenders are willing to consent to Debtors' use of the Pre–Petition Collateral and Cash Collateral only upon the conditions contained in this Order. . . ." (*Id.*, at 6.) In other words, the adequate protection was granted in exchange for the Original Lenders' agreement to let the debtors use their collateral. If they did not have any collateral, they did not have an interest in prop-

erty of the estate to protect, and did not get adequate protection. To the extent Sovereign suggests that the parties intended through the FCCO to grant adequate protection to Sovereign for its unsecured claim, it has failed to adduce supporting evidence.

Accordingly, the objections by the Original Lenders and Sovereign as holder of the VSI Guaranty are overruled. The Court has considered the other arguments that they made, and concludes that they lack merit. The foregoing constitutes the Court's findings of fact and conclusions of law. The parties are directed to schedule a hearing to determine if there are any other confirmation objections outstanding, and if not, to consider the terms of any proposed confirmation order that should be drafted and circulated before then.

So ordered.